

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

ADW

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

December 2, 2025

<u>By ECF and E-mail</u>
Hon. Cheryl L. Pollak
United States Magistrate Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:   <u>United States v. Iyesata Marsh</u>
             <u>Case No. 25-MJ-338</u>

Dear Judge Pollak:

      In connection with today's presentment of defendant Iyesata Marsh on a removal complaint in connection with charges pending against the defendant out of the Western District of Louisiana, please find attached a detention letter prepared by the U.S. Attorney's Office for the Western District of Louisiana.

                            Respectfully submitted,

                            JOSEPH NOCELLA, JR.
                            United States Attorney

              By:   /s/ Andrew D. Wang
                            Andrew D. Wang
                            Assistant U.S. Attorney
                            (718) 254-6311



**United States Department of Justice**

*United States Attorney's Office*
*Western District of Louisiana*

---

Tom Stagg United States Courthouse　　John M. Shaw United States Courthouse
300 Fannin Street, Suite 3201　　　　　800 Lafayette Street, Suite 2200
Shreveport, Louisiana 71101　　　　　　Lafayette, Louisiana 70501
Phone: (318) 676-3600　　　　　　　　Phone: (337) 262-6618
Fax: (318) 676-3641　　　　　　　　　Fax: (337) 262-6682

December 2, 2025

**via e-mail**

The Honorable Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

　　　　Re:　United States v. Iyesata Marsh
　　　　　　WDLA Docket No. 3:25-MJ-216

Dear Judge Pollak:

　　The government respectfully submits this letter in support of its motion for an order of detention for defendant Iyesata Marsh (the "defendant" or "Marsh"), because she presents a serious risk of flight. See 18 U.S.C. § 3142(f)(2). Marsh, a resident of Jamaica, New York, was arrested today on a complaint issued by the United States District Court for the Western District of Louisiana charging her with bank fraud, in violation of 18 U.S.C. § 1344, and aggravated identity theft, in violation of 18 U.S.C. § 1028A. She will make her first appearance today before Your Honor. Given (1) that Marsh has no ties to the district of prosecution; (2) the strength of the government's case; (3) Marsh's access to stolen identity information; and (4) the serious penalties Marsh faces if convicted, a detention hearing is authorized and there is no condition or combination of conditions that can reasonably secure her appearance in court. She should therefore be detained.

　　I.　　Background

　　As detailed in the complaint issued in the Western District of Louisiana earlier today, the FBI's investigation to date reveals that on December 30, 2022, Marsh applied for and obtained an auto loan from J.P. Morgan Chase Bank, N.A. ("Chase"), a federally insured deposit institution that processed the subject loan in Monroe, Louisiana. Loan records (the "financing records") indicate that this loan was in the amount of $48,697.44, to purchase a 2019 Land Rover Range Rover Sport (the "2019

1

Range Rover") from Dealership 1, which is in Florida. The financing records listed Marsh as a "co-owner" or "co-customer" and listed Victim 1, an Ohio resident, as the "customer" or "owner." The financing records also provided Victim 1's name, date of birth, and Social Security number.[1] The financing records listed two phone numbers for Victim 1, one of which is associated with another person, Subject 1, who is also a subject of the investigation. The other phone number is associated with Marsh's Brooklyn, New York business. The financing records also listed an email account ("Email Account 1"), as the contact email for Victim 1. The financing records listed the same residential address in Florida for both Marsh and Victim 1.

The financing records list a telephone number and an email account ("Email Account 2") that are used by Marsh. Specifically, Marsh is the subscriber of a cloud storage account in her name with an internet services provider that uses Email Account 2. That cloud storage account is also used to back up the same telephone account number that Marsh used on the financing records. Email Account 2 appears to be the primary email account used by Marsh. For example, it is listed on at least one bank account in her name. By contrast, Email Account 1, which was provided as Victim 1's email address on the financing records, appears to have been used by Marsh and potentially others in connection with the fraud scheme. Specifically, records obtained pursuant to an order issued under 18 U.S.C. § 2703(d) establish that Email Account 1 was created on December 23, 2022, using a version of Victims 1's name. This was the same date of a credit score document for Victim 1 located in the financing records. Additionally, the phone number and Email Account 2 that Marsh used for herself on the financing application with Dealership 1 are the subscriber phone number and the recovery email address for Email Account 1. After the sale of the vehicle was completed, Marsh took possession of the 2019 Range Rover from Dealership 1 through another person.

In January 2025, Victim 1 completed a forgery affidavit with Chase concerning the above loan. In this affidavit, Victim 1 affirmed the following: (1) that she did not sign her name to the loan application with Chase; (2) she did not receive any money, goods, services or other benefit from the transaction: and (3) the transaction was made without her authorization. Victim 1 also provided a handwritten statement to Chase, in which she said that in 2021 she lived with Subject 1 while the two were dating, but they broke up in 2022. Victim 1 wrote that Subject 1 had access to Victim 1's "Social Security and ID" while they were dating. Victim 1 said that she had never met Marsh and was not in Florida when the car was purchased. Victim 1 also said that she had confronted Subject 1 after learning about the loan, and Subject 1 told her that Marsh is his aunt.

Also in January 2025, Victim 1 also filed a police report and request for prosecution in Ohio. During a recorded interview related to that report, Victim 1 said that this issue was "ruining" her life, and she had recently found out that her ex-significant other's aunt used her name and information to buy a car in Florida. Victim 1 said that she learned about this after she began receiving mail addressed to her residence, which had switched her true last name with her ex-significant other's last

---

[1] The date of birth provided for Victim 1 on the application was incorrectly listed as exactly one year off.

name, and thanked Victim 1 for applying for loans. Victim 1 said that eventually she decided to check her credit report and learned about a loan in her name at Chase, which she did not apply for. Victim 1 then said that she had spoken with Chase while trying to investigate the loan in October 2024, and during that call Chase asked Victim 1 how long she had been in the Navy, to which she responded that she had never been in the Navy. Victim 1 then showed the investigator a payment record from Chase for $2,000 to the Chase loan from an account at Navy Federal Credit Union which posted on February 26, 2024. Records later revealed that this payment was made from a Navy Federal Credit Union account held in Marsh's name.

During the FBI's investigation, two employees of Dealership 1 were interviewed in late November 2025. One employee recalled meeting both Marsh and Victim 1 as part of the purchase of the 2019 Range Rover.[2] This employee described Marsh as the primary customer and main driver during their interactions. Following this employee's identification of Victim 1, Victim 1 was interviewed by the FBI. Victim 1 reaffirmed that she does not know Marsh and did not seek or authorize the loan for the 2019 Range Rover. To support her statements, Victim 1 presented to interviewing agents several photos and their associated metadata on her cell phone showing that she was in Ohio in December 2022. Additionally, after the interview, Victim 1 provided more than twenty photo to the FBI with metadata indicating that she was in Ohio or California on various dates in December 2022. These photographs also showed that Victim 1 was in Ohio on December 22 and 23, 2022. Finally, Victim 1 also provided agents with social media records showing that she was exclusively in Ohio and California during December 2022.

Evidence also suggests that Marsh still maintains possession of the 2019 Range Rover in New York City. The FBI has observed a man who is believed to be an immediate family member of Marsh's driving the vehicle on multiple occasions over the past month. FBI surveillance has also observed the 2019 Range Rover parked in the vicinity of what is believed to be Marsh's Jamaica, New York home several times in the past month.

---

[2] As indicated in the complaint and later in this letter, there is substantial evidence indicating that this employee's recollection of Victim 1 being at the dealership in December 2022 was mistaken.

## II. Legal Standard

### A. The Bail Reform Act

The Bail Reform Act of 1984, 18 U.S.C. §§ 3141-56, provides that, in general, a court "shall order" a defendant's pretrial release unless the court determines that the defendant presents an unreasonable risk of flight or "will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b). Detention inquiries are a two-step process. First, the court must determine whether a detention hearing is authorized. A detention hearing is authorized only if the government establishes by a preponderance of the evidence that the case involves one of the offenses enumerated in 18 U.S.C. § 3142(f)(1) or that the defendant presents certain risk factors identified in 18 U.S.C. § 3142(f)(2), including, as relevant here, a serious risk the defendant will flee. See, e.g., United States v. Watkins, 940 F.3d 152, 158 (2d Cir. 2019). Second, if the court determines that a detention hearing is authorized, the court must consider whether any condition or combination of conditions will reasonably assure the defendant's appearance at trial and the safety of the community by applying four factors listed in § 3142(g). See, e.g., United States v. Berrios–Berrios, 791 F.2d 246, 249 (2d Cir. 1986). The government must ultimately persuade the court by a preponderance of the evidence that the defendant is a flight risk or by clear and convincing evidence that the defendant is a danger to the community. United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001).

Whether detention is sought on the basis of flight or dangerousness, the Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged; (2) the history and characteristics of the defendant; (3) the seriousness of the danger posed by the defendant's release; and (4) the weight of the evidence against the defendant. See 18 U.S.C. § 3142(g).

### B. Proceeding by Proffer

Evidentiary rules do not apply at detention hearings and the government is entitled to present evidence by way of proffer, among other means. See 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000). In the pre-trial context, few detention hearings involve live testimony or cross-examination. Most proceed on proffer. See LaFontaine, 210 F.3d at 131; see also United States v. Boustani, 356 F. Supp. 3d 246, 251 (E.D.N.Y. 2019) ("courts often base detention decisions on hearsay evidence"). This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." LaFontaine, 210 F.3d at 131 (internal quotation marks omitted).

## III. The Defendant Should Be Detained Because of Her Flight Risk

Marsh should be detained based on the risk of flight that she presents. A detention hearing is authorized based on this risk and because no conditions can mitigate that risk to reasonably assure her appearance in court. First, the defendant

4

has no known ties to the Western District of Louisiana, which supports the conclusion that she will not appear there to face the serious charges filed against her in that district.

Second, the strength of the evidence factor counsels in favor of detention. Marsh is connected to the fraudulent loan through, among other things, her presence in the dealership during the purchasing process, her use of the 2019 Range Rover, and her apparent creation and use of an email account in Victim 1's name that was used on the loan forms. This strong evidence of guilt provides "a considerable additional incentive to flee." United States v. Millan, 4 F.3d 1038, 1046 (2d Cir. 1993); see also United States v. Sabhnani, 493 F.3d 63, 76 (2d Cir. 2007) (finding detention appropriate because, in part, "the evidence of [the defendants'] guilt, both direct and circumstantial, appears strong"); United States v. Palmer-Contreras, 835 F.2d 15, 18 (1st Cir. 1987) (per curiam) (where "the evidence against defendants is strong, the incentive for relocation is increased"); United States v. Bruno, 89 F. Supp. 3d 425, 431 (E.D.N.Y. 2015) ("When evidence of a defendant's guilt is strong, and when the sentence of upon conviction is likely to be long a defendant has stronger motives to flee.").

Third, the investigation has revealed that Marsh used Victim 1's personal identifying information to commit fraud. This access to stolen identity information amplifies the risk of flight, since stolen information can be used to evade law enforcement. Along a similar vein, the investigation has revealed records of Marsh's name being associated with three different Social Security numbers, which also undergirds a concern that she cannot be monitored appropriately. Taken together, these facts support detention. See United States v. Williams, 654 F. App'x 3, 4 (2d Cir. 2016) (affirming order of detention in part based on defendant's repeated use of aliases "to evade oversight and detection from government agents"); see also United States v. El-Hage, 213 F.3d 74, 80 (2d Cir. 2000) ("apparent access to false documents" supports a finding that a defendant poses a risk of flight); United States v. Baig, 536 F. App'x 91, 93 (2d Cir. 2013) (affirming order of detention in part because the charges "centered around false documentation").

Fourth, Marsh faces a significant sentence if convicted. The aggravated identity theft charge, which is underpinned by significant evidence, carries a two-year mandatory term of imprisonment that must be imposed consecutive to any prison term on the underlying bank fraud charge. This also shows why Marsh presents a serious risk of flight. See United States v. Zhang, 55 F.4th 141, 151 (2d Cir. 2022) ("The prospect of a severe sentence can create a strong incentive for a defendant to flee and thereby avoid that sentence."); United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (holding that the possibility of a "severe sentence" heightens the risk of flight).

Finally, conditions less severe than detention, like home detention and electronic monitoring, will not sufficiently mitigate the defendant's risk of flight. These conditions "at best elaborately replicate a detention facility without the confidence of security such a facility instills." Millan, 4 F.3d at 1049. Thus, "[i]f the government does not provide staff to monitor compliance extensively, protection of the community would be left largely to the word of [the defendants] that [they] will obey the

5

conditions." Id. Indeed, recent history in this District demonstrates that numerous defendants have fled or otherwise attempted to thwart electronic monitoring after being released on bail. See, e.g., United States v. Elianor, No. 16-CR-288 (AMD) (in March 2025 defendant fled after being arraigned on a violation of supervised release for attacking a witness who had previously testified against him in a state murder trial and remains at large); United States v. Shen, No. 25-CR-48 (HG) (in January 2025 defendant cut her electronic monitoring device at JFK Airport the day before she was required to surrender to the Bureau of Prisons); United States v. Dali, No. 24-MJ-645 (JAM) (in December 2024 defendant cut her location monitoring device while on pretrial release and absconded to Canada, where she was apprehended at the border). Here, given the risk of flight presented by this defendant, it would be reasonable for the Court to conclude that she will not abide by home detention or electronic monitoring conditions.

### IV.   Conclusion

For the reasons set forth above, the government respectfully submits that a detention hearing is authorized and that no condition or combination of conditions can reasonably assure Marsh's return to court. She should be detained and removed to the Western District of Louisiana.

Very truly yours,

ZACHARY A. KELLER
United States Attorney

_____
SETH D. REEG
Assistant United States Attorney
Western District of Louisiana

ALLISON L. DUNCAN
Assistant United States Attorney
Western District of Louisiana